May it please the Court, Counsel? My name is Marco Mirkonich. I'm here today on behalf of St. Paul Park Refining Company, the respondent in the underlying unfair labor practice matter and the appellant and petitioner in this matter. I request to reserve three minutes for rebuttal. Our practice is you'll need to pay attention to your clock and make sure you've saved yourself sufficient time. I will do my best. Okay. This is an appeal from a decision by the National Labor Relations Board finding a violation of 8A.1 of the National Labor Relations Act arising from the 10-day suspension of the individual charging party, Rick Topor, in November of 2016. Taken together, the questions and issues presented pose the following inquiries for the Court for decision. First, does the National Labor Relations Act properly construed and applied insulate an employee from the disciplinary consequences of a failure to engage in discussions with the supervisor and other serious policy violations because he had engaged in arguably protected behavior five and a half hours earlier? And from our position, the answer is no. No such cloak of protection exists and applies to employees. Once they have expressed concerns, they still have to behave themselves in the workplace or face the consequences of their decisions. Phrased conversely, the question is does the National Labor Relations Act prevent an employer from disciplining an employee when it reasonably believes he has engaged in insubordinate behavior and clear violations of company policy after an appropriate investigation simply because the employee claims to have raised safety issues hours earlier? And again, we say the answer is no. And you can look and see that no other employee involved in the earlier safety issues was disciplined and the timing of the imposition of the discipline correlates to the insubordinate and policy-violative behavior. I'm sorry, you said no other employees involved in what? In the earlier safety reporting were disciplined. In the morning of November 4th, 2016, two bargaining unit employees, Rick Topor and Mike Rennert, expressed concerns about performing a task. I was going to ask you about, if you don't mind an interruption, I think it's of relevance. The board asked that the unobjected to portion of the decision be summarily affirmed. What is that about? Your Honor, it's an effort to engage in sleight of hand from our perspective. The board, in making that request, cites to Administrative Law Judge Mueller's order as referring to an unobjected to portion. It is very much objected to. The underlying complaint makes no reference to any alleged violations of the act involving anything other than Mr. Topor and his activity. It's within that context that that provision needs to be looked at. What we have positioned is that the provision in the order to which the board refers is actually a remedial provision based on a claim that a supervisor had earlier talked to Mr. Rennert about bargaining issues. Judge Mueller said that's, and the board then adopted Judge Mueller's findings, said, well, that's a violation of the act. Well, that's not part of the complaint. If you look at the complaint, there's no allegation that that was a violation of the act. So that provision of the order can only be viewed as a remedial provision tied to Mr. Topor's claims. And we have objected vociferously and at great length, as the court has undoubtedly read, to the finding of a violation. So because the underlying violation is not sustained from our perspective, then that remedial provision also falls down. And there is no unobjected to portion of the order. I would also note that exception 27 submitted to the board specifically objects to that factual finding. And as a matter of just further reference, and without giving it more attention than is due within the overall scheme of the issues presented, there was a claim at the time of the trial that there was a violation of 883 of the act and that Mr. Topor was picked out for discipline because of his status as a union steward. Judge Muell found against the union and against Mr. Topor and against the general counsel's office on that claim. No review was sought of that part of the ruling. So therefore, the reason that factual element was in the trial record is because it related to the 883 claim, not because it related to the 881 claim. So we think it's far from being agreed upon. It's very much disputed. And it's part of the claim that Mr. Topor was treated unfairly in the complaint. Thank you. So if you look at where we are today, the question on review is basically, is there substantial evidence in the record and do the findings and rulings of the NORB, are they sensible, is the way the court has phrased it. And our position is they absolutely are not. The facts themselves are straightforward. There was a day at the refinery where there was a task to be done. In the morning, Mr. Topor and Mr. Rennert said, we don't feel that task is safe. This is a refinery that encourages safety, has many policies encouraging safety, and part of those policies requires that employees raising safety concerns bring them to the attention of management and engage with management to find ways to mitigate the safety risk. It's not enough just to say safety and sit down. You have to engage. In the contract, Article 22.1 and 2, makes clear that once a safety concern is raised, it's the company's responsibility to review the safety factors and to determine whether to proceed with the work. It's the company's responsibility and decision under the contract. So the employee raises it, participates in a mitigation discussion, and then it's up to the company to decide whether it proceeds. All of that and all of those policies are in writing. In the morning of November 4th, at 9.30, Mr. Rennert and Mr. Topor raised these questions. The company spent the next five hours stopping the job, working with the engineering team that is in charge of providing the safe process for carrying out this responsibility, and they made the adjustments needed. The ALJ made very detailed and specific findings with respect to all of these matters. The ALJ made findings. We don't believe they're tied to the record, and I think that's one of the underlying problems, and it's why, for example, at one point we literally took his findings and cited five pages of transcript testimony to show just how far afield from the actual testimony the ALJ wandered. But on this part of the ruling, the ALJ said in the morning these issues were all addressed, there's no real dispute, and the ALJ also said in the afternoon those concerns raised by Mr. Topor starting at about 3 or 3.30 in the afternoon after a five-hour interlude were in fact individual concerns raised by him individually. That's not protected concerted activity. And in the afternoon, once the step change had been drafted by the engineers and brought out to the field, Mr. Topor was slow to respond when asked and called on the radio. He came out and was unwilling to engage in a discussion about ways to mitigate the safety concern he claimed to have identified. And in fact, what happened was his supervisors then went out, looked at the equipment and said, Rick, come on out here, let's look at this, let's talk about it. He refused to engage. At that point they said, look, it's time for you to go home. You're not doing your job. You don't have this cloak of protection as referred to in the NORB case that we cited in our reply brief. And he went home. But before he did, he refused to turn over the written step change that had been prepared by the engineering team, and he took it with him. Now he says, I didn't hear a request to hand it to me. The supervisors are very clear that he did hear it. It was clearly communicated. But regardless, there's a workplace policy that says you cannot remove property from the plant and the facility, and that includes process change documents and plant documents that are proprietary in nature. Mr. Topor admits that he took that home, admits basically that he violated the policy. He also admits he engaged in no discussion. After this, the supervisors in question presented that information that same day to the HR department and to the plant manager, the number two plant manager, Michael Watley. And they described the event with Mr. Topor raising his voice, pointing his finger, doing and behaving insubordinately. And, in fact, after that, Mr. Topor was sent home. An investigation took place. Six or seven people were interviewed. Six or seven people provided statements. As a result of that investigation, the company reasonably believed and reasonably determined that Mr. Topor had violated its rules and regulations. They determined that it was appropriate to suspend him, and, in fact, that's what they did. Can I ask a question? Sure. Why was it necessary for him to be sent home that day? Because of the way he was behaving in his interactions with the supervisors. According to the supervisors— I mean, is that not something—there's no—he's no longer performing his task. I know this was a refinery, correct? Correct. You know, refineries are very hazardous places. They can be. And they do very sensitive work. But it just occurred to me that why wouldn't this be a situation where he would be put to work in another position and some sort of investigation would be conducted internally? It would seem that might be a way of avoiding some of this instead of summarily sending him home. And I think I recall that that's one of the things that was cited here was the abruptness of the decision. Your Honor, with respect to the record, what it shows is that during the interaction with the supervisors, he refused to engage in discussion. That's a refusal to carry out his work assignment, and people who refuse to carry out their work assignments are sent home at the refinery. Because you need to have people who are following the work rules and not behaving insubordinately. And then before you impose discipline, so the way it is, you're sent home on administrative leave, not on a suspension, and then the investigation determines whether that's a paid administrative leave or a suspension. But in essence, you have to remove the employee from the workplace. Note that at this time of day, Mr. Topor is not engaged in protected, concerted activity. The union grievance went to arbitration, and again, one of the claims here is that was not properly considered by the board, but that arbitration found the company had just cause for the suspension under the contract. So those arguments are more contract-based. Here the issue is whether Mr. Topor engaged in protected, concerted activity, and we say clearly not in the afternoon. Second, did the company have animus toward what was going on? And the board argued you can tell it had animus because it sent him home. Well, that's circular, because the alleged adverse employment action is he was sent home, and how can the evidence that that's motivated by animus be he was sent home? I thought it was more the abruptness rather than just the fact that he was sent home. Am I incorrect? I believe the record shows it's because he was sent home, not because of the abruptness acting alone. Before you run out of time, I'm sorry, I wanted to ask you about the possible application of the inter-borough doctrine here rather than the logical outgrowth theory. Your Honor, that was advanced as an alternative argument, was it not? It was, but I can't tell if it's being advanced still or has been abandoned. I was wondering whether it's something we could resort to. I'm not sure in the context of an agency appeal like that whether alternative grounds can be used to affirm or not. You don't need to use any more of your time on that. Your Honor, inter-borough doesn't apply because there's no contract right here. The contract required the employee to report, and then it permitted and required the company to decide whether to proceed with the action. So by refusing to engage, there's no inter-borough right at issue here. Thank you. Thank you, counsel. All right, Mr. Lauro, you may proceed when you're ready. Thank you, Your Honors. May it please the Court, I am Greg Lauro for the National Labor Relations Board asking the Court to enforce the Board's order because its findings of protected activity and the unlawful suspension are supported by substantial evidence and reasonable credibility determinations. I think it's helpful to go back to the facts underlying the discussion the Court had with my opponent this morning about what happened on the afternoon of November 4th when the Board found Mr. Topor continued to engage in protected activity. And as the record shows and the Board found, Mr. Topor was reassigned this task that he and his co-worker had raised safety concerns about that morning. It was assigned to him, and he pointed out, well, the problem is the step change form you gave me says in Step 2, you have to remove these other cylinders. So Mr. Topor reasonably believed that was a problem. The company wasn't following its own policies and that there was a risk of explosion or other danger. And as the record shows, one supervisor's response was, well, can you mitigate that by keeping all of the cylinders in place and putting a heat insulation blanket there? And Mr. Topor responded, and again, the Board found this is a continuation of the protected activity. I believe that still poses a risk of explosion, and it's still contrary to company policy. And I point out that was part of Mr. Topor's concern. The company was not following its own written document, which says, remove other cylinders from the area of the one being heated. And that was the consistently communicated message by Mr. Topor throughout the afternoon. It was not, as my opponent said, that there was this big break, that suddenly the protected conduct ended midstream. And my opponent says, you can't state your protected message and just sit down, or as they say in their brief, just completely refuse to discuss. But the record shows that's not quite what happened. Mr. Topor kept explaining his safety concerns when he felt pressured to do this mitigation procedure and this task he felt was unsafe. And he also consistently pointed out the problem here is what you're asking me to do is contrary to the company's written policy. And if you want this different procedure to use insulation blankets, you would have to rewrite the policy. That's the company's rules. When you have a new procedure, you have to write it out. So there isn't this break between the protected activity in the morning and some allegedly unprotected activity in the afternoon that my opponent hangs their argument on. And they raise a few other things, that there was a five-hour delay here. But I would point out, some of that delay was so the company could follow its own policies. In the morning, the two employees said, we're not sure this is safe, but we seem to need a procedure for it. Because the company had changed its procedure without following its own rules to write that change out. It took them time to do that. And then when it was reassigned to Mr. Topor, he said again, as we've discussed, you're still not following your own policy. It says remove the cylinders. And so it took time to discuss that situation. So again, there was no break in the protected activity. It was a continuation of protected activity. And as to motive, the board relied not just on the employer's statements at the time it decided to send him home, which included saying, we're troubled by the fact you wouldn't do the work we told you to do. Includes what? Oh, when the employer sent Mr. Topor home, according to the supervisor's documentation, they said it had to do with issues of Mr. Topor not doing the work they directed him to do. But that's the protected conduct of saying, I'm calling a safety stop and refusing to do work I reasonably believe is dangerous. Here we have documentation that this is a dangerous chemical, that steam heating it causes a risk of explosion. And so at that time, in addition to that statement, which is linked to protected activity, and I think the board reasonably found that even this idea of refusing to discuss mitigation is also inextricably linked to protected safety protest, we have other evidence of motive. Of the kind this court has said the board can permissibly rely on. What the board found was an inadequate investigation, shifting and pretextual explanations, changing stories. And really, although my opponent opposes this finding that some of the conduct they relied on didn't occur, the finger pointing, the shouting, that comes down to my opponent having to show that the underlying credibility determination shocked the conscience. It's a very heavy standard to meet. I submit they don't meet it. At best, they offer an alternative view, that this evidence could support our view, or perhaps this witness could have been credited, but they don't come close to showing the course. I'm kind of interested in that standard of review. I certainly know about deference being given to ALJs or even being highly deferential, but shocking the conscience is one I hadn't seen before in 30-odd years. Is that common in these contexts? Well, it's the court standard. I realize it's a burden, but shocking the conscience is almost impossible, isn't it? It's very strong wording, and that's the court standard. As to whether it's common, what I will say is common is other courts have standards like inherently incredible, patently unsupportable. They're all very, very hard standards to meet. Is that a phrase that we frequently use in this context? Shocks the conscience. I think it is the phrase the court uses when you have these kinds of challenges. I know we did once, but I'm just wondering if that's okay. No, no, no. I understand your Honor's point. Other courts use, although not that exact language, very, very deferential standard. And I think one reason for that is the judge is there to observe the witnesses and their demeanor and to have that firsthand knowledge. And a lot of the credibility findings we have here are demeanor-based, as well as based on the fact that the company's witnesses shifted stories. They're very detailed and specific. Very detailed credibility determinations. Is this an appropriate point to interject my question about inter-borough and its possible application? Of course. The board stated that it did not rely on that doctrine as an alternative means for finding protected activity. Right. Now, I understand the court can look at the record and the law and assess whether it believes it could enforce on that basis. But I feel it's my duty to point out. There's no impediment to that in the agency situation. Well, that's why, Your Honor, I feel it's my duty to point out, as we did in the brief, that the board said it was not relying on that doctrine. Right. I know. So what does that do with respect to our capacity to reach that question? Anything? I think it would put into question whether this court could rely on something the agency said it wasn't relying on. Well, that's my question. Yeah. I think it would definitely undermine that possibility. But you just said before that we could affirm on an alternate ground if we wanted to. I'm saying that it would be up to the court if they feel an alternate ground is supported by the law and the record. I'm just acknowledging there's some caution in play when the board said they're not relying on it. There's some caution in play? I'm sorry? Oh, there's some caution in play. Sorry, Your Honor. I'll try and speak right at the microphone. No, I don't hear what else. Now, your call. What I can say is some caution is warranted when the board said in a footnote, we're not relying on the inter-borough doctrine here. But I would not presume. I mean, even without the footnote, it's pretty obviously warranted. But never mind. I understand, Your Honor. But I'm happy to answer any questions the court has about protected activity or animus in motive. But I did want to respond to something Your Honor raised this morning as well, which is the other violation that we say is unchallenged with respect to Mr. Renner. And one reason we say it's unchallenged, and I think this is quite clear, is that the violation is not mentioned by my opponent in their opening brief to this court. This court has said that issues that are not meaningfully argued in the opening brief are waived. And I'd be hard-pressed to understand how something that's not even referred to in the brief is meaningfully argued. And although they also point out they believe they raised it to the board, the board rightly found that this was just a conclusionary exception. It just said, we think this finding of this other violation is wrong. It didn't say why. And that kind of bare exception is insufficient to preserve it for judicial review. But also, this was a separate violation. If you look at page 17 of the judge's decision, it finds this is a separate violation of a threat against Mr. Renner. They also looked into whether that separate violation could be evidence of an additional violation against Mr. Topper, but there's no merging of this into Mr. Topper's violation so that my opponent can say they preserved it. And I'm not trying to make it more complicated than it is, but I would also point out the amended complaint, this is in page JA302 of the record, lays out this additional violation. So there's no due process issue if my opponent wasn't told about it. But I just wanted to be clear, this is an issue they didn't raise in their brief, that they didn't properly raise to the board, so they can't raise it now. Some reinforcement is warranted. But in sum, Your Honor, I know I still have a few minutes for any questions the court has. I think that substantial evidence, which is the standard, supports the board's finding that Mr. Topper continued to engage in protected activities throughout the afternoon of November 4th. He continuously communicated his concern that this was a dangerous task, a risk of explosion, and that it was contrary to company's own policy, which said remove the other cylinders, and that there's substantial evidence for the finding that this protected conduct was a motivating factor in the decision to discipline him. And we have ticked through it. It's the reasons the company stated. It's the inadequate investigation. It's the reliance on shifting and pretextual investigations. All things this court has said, including in RELCO, may permissibly support a finding of unlawful motive. If you were going to just lay out to us the alleged shifting explanations, what would you cite? What would be the clearest examples of those in the record? Of course, a few examples are when you look at page 601 through 606 of the joint appendix, in particular, actually both of those, that's Mr. Regenscheid and Mrs. Young's, the supervisor's statements, they lay out, Mr. Regenscheid starts by saying the problem here is you didn't do what I directed you to do. Mrs. Young also notes you didn't discuss mitigation the way we wanted you to. Three days later, they add additional allegations that Mr. Topper pointed his finger in a supervisor's face, raised his voice, and it was interesting she left this out, and this is one reason the judge found that was a suspicious shift. She testified that was such a striking event to her that she couldn't forget it, but she left it out of her initial statement. And so the judge reasonably found, based on the shifting explanations that he believed weren't credible, that that misconduct didn't occur. It was a pretextual allegation. And there's also the issue of his not returning the form, and the claim was you heard us ask this, and you willfully returned it. I think Mr. Regenscheid says you were right there, and I tried to take it, and you pulled away from me. But the credited testimony shows that didn't happen. The judge chose to believe the one neutral employee witness, Mr. Renner, who said Mr. Topper was farther away. It was loud. He wouldn't have heard it. Now, could there be evidence either way? Could one debate that finding? Perhaps, but it doesn't shock the conscience, or it's not patently unsupportable to credit that testimony. So that's a couple of examples, Your Honor. I believe there may be others in our brief and in the record, but under this court's law, it's sufficient to sustain a finding that the protected conduct was a motivating factor for this discipline, and that's enough for a violation under right line, and therefore enough for this court to enforce the board's decision. So with that said, unless the court has additional questions, I thank it for its time again. There's substantial evidence of a finding of continued protected activity, and that that activity was a substantial motivating factor for the adverse action. Given the statements of why the discipline was issued, the shifting and protectual explanations, and the inadequate investigation, and if I may make one point in closing, the board was not saying the investigation had to be perfect, or that there's a certain number of witnesses you have to interview. The board specifically said that wasn't what it was doing. As you can see from the decision in our brief, the problem was how one-sided the investigation was, that you had a list of other witnesses who might provide different testimony, but you decided not to interview any of them, even though you had these conflicting accounts. We have two supervisors saying finger-pointing, shouting. You have an employee, Topper, who denies it. You have a neutral employee, Olson, who says, I didn't see any finger-pointing, and the investigator hastily and abruptly credits the supervisor's conflicting account, the contradicted account, without asking all these other witnesses. And if I may say, Your Honor, the problem for the credibility got worse when that gentleman, Mr. Currents, took the stand, because as the board found, his explanation for not looking at any of these other witnesses defied logic. He said, well, I just assumed they had no relevant information. Well, that's willful ignorance. He said, well, I didn't know they were in the area. Well, Ms. Young's witness statement said they were in the area and he didn't ask, and he said, well, I didn't think they were involved. One doesn't have to be involved in conduct or a conversation to bear witness to it. And on and on. I would just submit it came down to credibility, and the judge reasonably found that Mr. Currents' story about why he left out all of these other witnesses didn't hold water. So thank you very much, Your Honors. All right.  One minute, 52 seconds, Your Honor. Your Honor, I think the most recent colloquy reveals the exact problem here. Instead of trying to determine what the company reasonably believed, the administrative law judge said, what are the facts? That was the improper inquiry. He applied the wrong legal standard. In this case, the company reasonably believed that Mr. Topor had engaged in insubordinate activity. There were no shifting explanations. On the very day of the event, on Friday afternoon, Ms. Young reported to Mr. Watley and to Mr. Currents that the finger wagging had taken place. It was not in her original written document. She amended the written document on the next shift that she began. So when they say three days later, this is the kind of misleading testimony that often happens. It was three days later because she had two days off in between the end of the shift where she sent him home and had to get the job done, and second when she returned to work and was done immediately. The question is not what would the board have done as an investigation. It's whether the company acted reasonably. And it interviewed one bargaining unit member but not others because this event happened partially within a satellite unit, partially without. No bargaining unit member had visibility to the entire event.  So they can't prove a negative. They can't prove and nothing they could say would say Mr. Topor did not, in a credible way, wag his finger. That was a determination that could only be made by Mr. Topor and the two supervisors who were present for the entire event. The bargaining unit employees all testified that they were not there for the entire event and they could not have observed the entire event. The board substituted its judgment for the reasonable belief of the employer. Finally, Your Honor, Mr. Topor did not engage in protected concerted activity in the afternoon. He refused to engage in discussion. He was never ordered to do the work to which he objected. All he was ordered to do, the work he wouldn't do, was discuss with his supervisors. And because he wouldn't, he was sent home. And that failure is something he cannot base on a claim of a safety report earlier in the day. For that reason, we request that the court reverse and vacate the NORB's order. Thank you. All right. Thank you, counsel. The case is submitted. Appreciate your arguments this morning. And you may stand aside.